# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-21-00635-CV

---

**L. M., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

### FROM THE 200TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-FM-19-008396,
### THE HONORABLE AMY CLARK MEACHUM, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Following a five-day bench trial, the district court terminated the parental rights of L.M. (Father) to his daughter, A.M. (Daughter), born November 26, 2019. In two issues on appeal, Father challenges the sufficiency of the evidence supporting the district court's finding that termination of his parental rights was in Daughter's best interest. We will affirm the district court's termination decree.

## BACKGROUND

The case began in December 2019, when the Texas Department of Family and Protective Services (the Department) received automatic notification from the Bureau of Vital Statistics that W.S. (Mother) had given birth to Daughter. The notification was generated because of Mother's history with the Department, which included termination of her parental rights to two other children. The case was assigned to Department investigator Jessica Elarba.

At trial, Elarba testified that during her initial investigation, she received two referrals involving Father, one of which alleged that Father and Mother were found together in a stolen vehicle with "a plethora of knives and drug paraphernalia that was in the vehicle" and another alleging domestic violence committed by Father against Mother. Elarba further testified that when the case began, Mother and Father agreed to be tested for drugs. Father tested negative for all substances but Mother tested positive for amphetamines and methamphetamine. When confronted with the results, Mother claimed that Father, despite testing negative, had used drugs and had encouraged her to do so, telling her that "one hit wouldn't hurt."

The Department subsequently obtained an order granting it temporary conservatorship of Daughter but was unable to take immediate possession of the child because Mother and Father had taken Daughter to Arkansas to avoid the Department removing her from their care. Mother and Daughter were later found at a hospital in Fort Smith, Arkansas, and Arkansas CPS returned Daughter to Texas.

Much of the evidence presented at trial concerned the history of domestic violence between Father and Mother. Deputy Theron Oestric of the Travis County Sheriff's Department testified that on May 11, 2021, he answered a call from Mother in which she informed him "that she was assaulted several days prior by her baby's father." Oestric recalled that specifically,

> She said that they had been out. They came home. They'd been drinking. They had had sex. Went to bed and he had woke her up to have sex again. She did not want to, and he struck her. So she jumped out of bed and was trying to leave, and he grabbed her by the mouth and then was grabbing her by the neck, I believe.

2

As a result of the assault, Mother had "a busted lip," "ringing in her ear," and "lost her voice for several days." Mother also described to Oestric an incident in October 2020 at a Walmart in Marble Falls where Father had "punched her with a closed fist and knocked her tooth out." Mother told Oestric that she was trying to obtain a protective order against Father. A recording of Oestric's telephone conversation with Mother was admitted into evidence.

Desiree Hitchcock, who described herself as a "drinking buddy" of Father's mother (Grandmother) and who was engaged to Father's brother, testified about her experiences with Father's family, including her observations of Father's behavior. She described two incidents in which Father had been physically violent with her. During the first incident, in December 2017, Hitchcock and Father's brother were at the family's home,

> And [Father] had a bunch of CDs stacked, CDs, like music CDs, thousands of them stacked all over the countertops and the bars. We have this big, long bar. And I walked by, and I popped one of them, and it spread, and they scattered everywhere. And he, from across the room, just boiled over me, attacked. We rolled, and then he was on top of me. And a mutual friend pulled him off, and they put me in a closet in one of the back bedrooms. And then when [Father] thought I was gone, they were able to get me out of the house.

During the second incident, in March or April 2018,

> [Father] wanted me to leave. . . . He didn't like me anymore and [we] got into words. And I don't know who chest bumped who first, but we did some chest bumping. And I grabbed his T-shirt and—as he was grabbing me, and I ripped it all the way down. . . . I rip the shirt all the way down, and he threw me down on the ground, was on top of me and choking me . . . [a]nd [another man in the house] jumped up, grabbed [Father]. . . . And I get in my vehicle. And right as I get in my vehicle I look over, and [Father's] standing there with a shotgun in my face. . . . So I backed up very, very quickly, and that—that was that.

3

Hitchcock further testified that Mother had told her that Father was "controlling," "that she needed to get away from him," and "that he was going to kill her." Hitchcock added that Mother "was scared of him, and [Father] was violent" with Mother, including by "choking her out" when they had sex. Hitchcock also described an incident when Mother "came to see the baby at [the CPS office], [Mother] had a big welt, cut, not deep enough for stitches, but pretty . . . gaping." When Hitchcock asked Mother about the wound, Mother "said that [Father] had hit her with the end of a belt," specifically "the buckle part," and that "they had had an argument, but [Mother] was . . . telling everybody else that it was a . . . tree branch, and she was running, and it was a tree branch. But that [Father] had [hit] her with a belt." Hitchcock described another incident during which Father was carrying Daughter while she was in her car seat, "[a]nd [Mother] kept saying, Give me [Daughter]. Give me [Daughter]. And [Father] was like, No, and they were arguing. And . . . he swung the seat back, and it hit the wall" with Daughter still inside the car seat. Hitchcock added that she was "terrified" of Father and that he was a "violent man."

Mother's father (Grandfather) testified that he had witnessed Father's violence toward Mother on one occasion. Grandfather explained that Mother and Father had been living in his house in Rockport temporarily for two weeks in the summer of 2020. One night while they were there, Grandfather was away at his other property, and one of his security cameras "kept alerting" him that something "was going on" at the house. When Grandfather logged into the camera, he saw that

> [Father] had [Mother] down on the floor beside my dining room table and was hitting her in the head. And she was yelling, Dad, dad, because she knows I have cameras, hoping that she could alert me. And he was yelling, Justifiable homicide. Couple—he said that a couple of times. I—you know, I don't know exactly how many, but he did say, Justifiable homicide. I don't really know what

4

he meant by that; I guess if he kills her.

And then at that point, [I] took off in the truck. My other property's within maybe a quarter or half a mile, so I was there in a few—you know, a few minutes, a minute or two, pulled up in front of the house. [Mother] came flying out the door, didn't even use the steps, got about four steps. She cleared the whole thing. She ran across the yard and was trying to climb the fence to get out. At that point, I was trying—you know, getting the gate open, so she didn't have to climb it.

And then so I got the gate open, calmed her down, and went in the house. And at that point, I told him to get out of my house and never come back. And then he kind of, you know, Well, I don't have any place to go. I was, like, Well, you need to get out of my house and never come back.

So finally he said—said, Fine. And as he was leaving, he punched my front—I have two storm doors. He punched the outer storm door and shattered it all over the floor. Then he went outside.

Grandfather explained that Mother "was shaking. Her face was all red. She had blood on her, I am thinking in her hair and the back of her head, crying." Later that night, Mother went outside to be with Father and ended up driving Father back to his home in Spicewood, despite Grandfather offering to drive Father back there himself.

Grandfather also described other incidents in which Mother had told him that Father had been violent with her, including "one instance where him and her were fighting about something or he was batting her around . . . and he grabbed her basically by the face and jaw just to shut her up." On another occasion, Mother would "be laying there sleeping, and [Father would] come and just slap her extremely hard, you know, out of her sleep. She'd wake up, like, you know, What was that? Then, basically, you know, just verbal abuse whenever he talked to her and just total control." When asked if Mother had ever "express[ed] fear" of Father, Grandfather testified,

Oh, pretty much all the time. Like after one of the mediations, she came out and she said – she said, Well, they told [Father] everything that I filed against him, and he's going to kill me. And so at that point she said, Please come and get me. He's going to kill me if he finds me.

Mother, who at the time of trial was incarcerated in the Travis County Correctional Complex,[1] testified that she was homeless when she met Father. Father was living in his brother's house, and Mother "ended up staying there in exchange for work on the house." Over time, the two developed a romantic relationship. Prior to meeting Father, Mother had four children with other men.

Mother testified that she had used methamphetamine beginning in 2016 but that the last time she had used was in 2019. According to Mother, she "stopped using methamphetamine at the beginning of the pregnancy of [Daughter], and [she] had a quick relapse after she was born." Mother testified that "[f]or the entirety of" her relationship with Father, they had used methamphetamine together and that Father also had used marijuana and heroin. Mother admitted to having used marijuana in the past but denied using heroin.

---

[1] Mother's criminal history is not entirely clear from the record. In 2019, Mother pleaded guilty to the offense of credit card or debit card abuse in Travis County and was placed on community supervision. Mother testified that she also had charges out of Hays County for which she had been "released on a [personal] bond" in 2019, although she did not testify to the nature of those charges. In 2021, Mother was arrested in Travis County for the offense of aggravated assault with a deadly weapon after Father accused her of "attempting to run him over with [her] vehicle." Mother denied that she committed that offense. However, as a condition of her personal bond in Hays County, she was required to "maintain no new charges." Thus, when she was arrested for the assault charge, the amount of her personal bond increased, and she was arrested for violating her bond. Mother testified that rather than pay the increased bond amount, she "opted to just sit it out" in jail and "wait for [her] day in court." Mother subsequently pleaded guilty to the charges out of Hays County. Mother testified that "after she had resolved the situation here in Travis County," she would be "moving on to SAFP [the Substance Abuse Felony Punishment Facility] in Burnet," where she would reside for six months. Upon her release from there, she would go to a halfway house for three months and then return to her residence in Rockport, where she would serve the remainder of her probated sentence.

6

When asked why she had left Texas with Daughter, Mother testified that Father had told her "due to [her] background with CPS and it not being good, that [Mother] was sure to lose [Daughter], and [Mother] would take [Father] down with [her]. So if [Mother] wanted a chance with that, it was just best to disappear." According to Mother, it was Father's idea to leave the state. Mother explained that when they were in Arkansas, they learned that an AMBER alert was going to be issued nationwide for Daughter, so they decided that Mother would take Daughter to a hospital so that Father could avoid arrest on a possible kidnapping charge.

Mother described Father's assault of her at Grandfather's house as follows:

> [Father] showed up at my dad's house around four o'clock in the morning heavily, heavily, heavily intoxicated, and he broke—my dad has a screened-in front porch, and [Father] broke the glass on the screened-in front porch, reached in, unlocked the door, kicked in the front door to the house, proceeded to go straight at me, and ripped me out of the bed by the back of my head and began punching my head and slamming me against the floor.

She added, "He was picking—he was picking me up by my hair and my neck like this (indicating) and then throwing me down on the ground."

Mother testified that during the assault, Father called her "a piece of shit," a "cheating whore," and an "abandoner" for "leaving [her] family," and he told her that "this is what [she] deserved." Mother also testified that after the assault, Father told Mother that if she called the police and "turned on him at that moment, that [Daughter] was as good as gone, because we all knew that with my relinquishment/termination of my parental rights of my previous children, that I didn't have a shot in hell of getting [Daughter]." Mother explained that this was the reason she and Grandfather did not report the assault to law enforcement.

7

Mother recounted other assaults that Father had committed against her, including incidents when he "punched [her] right in the mouth" and "knocked out [her] front tooth" to get her to "stop talking"; "slammed [her] across the face, which gave [her] a bruise on the side of [her] cheekbone"; and slapped her across the face as she slept when he "wanted to have sex again." Mother estimated that Father had assaulted her between six and eight times during their relationship and that he had threatened her with bodily injury between 50 and 100 times. Mother also discussed various ways in which Father had controlled her transportation, employment, and friendships. Father would regularly remind her that she had "lost [her] kids," and he would often call her a "whore," "stupid," and "illiterate," claiming that she would "never amount to anything without him."

During the case, Mother entered into a partial mediated settlement agreement (MSA) with the Department and Daughter's guardian ad litem. The MSA provided that the Department would be appointed permanent nonparent managing conservator of Daughter and that Mother would have possessory rights to Daughter, including visitation rights. The agreement further provided that the parties agreed to seek the termination of Father's parental rights.

Grandmother testified that Mother lived with her "four to five months" after Mother became pregnant with Daughter, and Father moved in with Grandmother during the last month of Mother's pregnancy, in November 2019. Before that, Mother and Father were each incarcerated. Grandmother testified that at first, Mother and Father were "getting along great." She added, "[T]hey were excited. They wanted a baby." When Daughter was first born, Mother and Father were "very attentive" to Daughter, and Father "waited on [Mother] hand and foot, made all her meals, took every meal to her" because Mother was recovering from a C-section.

8

For the first couple of weeks, Mother was "pretty quiet," staying in her room most of the time, but Father "was ecstatic," helping to feed the baby and changing her diapers.

Grandmother testified that she cooperated with CPS when the case began, and after Daughter was returned to Texas, she was placed in Grandmother's care. However, Daughter was removed from Grandmother's care in May 2020 and placed in foster care after Hitchcock accused Grandmother of mixing alcohol with sleeping pills while caring for Daughter. Grandmother denied the accusation. Grandmother testified that she wanted Daughter back in her home and would be willing to take protective measures to get her back, including not allowing Father back into her home.

Grandmother testified that she had observed Father with Daughter during supervised visits and that "[h]e's great with her." She denied that Father had ever attacked her but acknowledged that he had yelled at her in the past, resulting in her reporting him to law enforcement on one occasion in October 2020. Grandmother also acknowledged that Father had a "horrible criminal past" and was aware of his drug use. Grandmother denied that she had ever observed violence between Mother and Father, although she acknowledged that she had seen them argue with each other. Grandmother also acknowledged that she was aware that Father had been violent with his brother "a couple of years ago," and she knew that he had a prior conviction for assault-family violence committed against a former girlfriend and multiple other convictions for assault. When asked if Father had ever "intimidated" her, Grandmother testified, "Probably, yeah." When asked if she would consider Father to be "a violent person," Grandmother testified, "To me, no. In general, yes." Grandmother further testified that Father was "financially unstable" because he had been homeless in the past and "right now he's not

9

working full time," with Grandmother needing to "help him financially" "[o]ff and on all his life." Father was thirty-eight years old at the time of trial.

Father testified that he was "thrilled" and "happy" when he first learned that Mother was pregnant with Daughter because he thought it was "an opportunity to change, you know, the way we've been living and turn—turn things around, start living a good life and act normal, be normal, get jobs and raise a kid." After Daughter was born and CPS showed up at Grandmother's house, Father and Mother consulted an attorney, and Father claimed that the attorney advised them to either leave the state or "hand the child over and just deal with CPS." Father testified that it was Mother's choice to leave Texas, that she left the state with Daughter first, and that Father followed them out of state "four or five days later." Father testified that he believed Daughter would be safe with Mother even though Mother had just tested positive for methamphetamine.

When Father returned to Texas in January 2020, he contacted the Department and began engaging in and completing various services, including a substance-abuse evaluation, a psychological evaluation, parenting classes, and individual therapy. He did not complete the Batterer's Intervention and Prevention Program (BIPP) because it was a 36-week program that was still ongoing at the time of trial. However, he claimed that he had completed a similar program in prison.

Regarding the alleged incident involving Mother assaulting him with her vehicle, Father testified that in the afternoon of August 3, 2021, he was "pulling out of [his] friend's house" in his car and had "just pulled onto the street," when he saw "[Mother] and her car come whipping around the corner of this street going really fast, 65 miles an hour in a residential neighborhood." He continued,

10

And she did not slow down, so I had to literally throw my truck in gear and—and just peel out and get in a ditch before she T-boned me at like 70 miles an hour. And so I burn off in the ditch to get away from her and then she was—you know, slams on her brakes, jumps out of her car, you know, while I'm trying to get out of the ditch and back onto the road, and just screaming at the top of her lungs, like—you know, a bunch of unpleasant things, that I dare not repeat right now. But I—I just took that as a—as a sign that I needed to get away from her just— whatever was about to happen was not about to be good, and I didn't feel safe, so I took off.

As Father drove away, Mother continued to pursue him in her vehicle, running him off the road at one point. As the chase continued, Father "hid behind some trees," got out of his vehicle, and contacted law enforcement. Father believed that Mother had tried to "murder" him in retaliation for "lies" that the Department had told her about him. Father claimed that he was injured during the incident, although he did not go to the hospital and he produced no evidence of his injuries.

Father denied that he had ever assaulted Mother, and he also denied the specific incidents of abuse to which Mother had testified. Father testified that he was not a violent person. When confronted with his prior assault convictions, including one for assault-strangulation and one for assault-family violence, Father testified, "Those are all part of my past. I'm not the same person that I was when these things happened." He denied assaulting his ex-girlfriends. Father claimed that his prior conviction for assault-family violence was against his brother and he "couldn't recall" the victim in the assault-strangulation case. He added, "I don't remember the details of those situations. They're all in my past, and I've moved forward with my life, made a lot of changes. They're not relevant to me."

Father testified that when Daughter was taken away from him, he started using drugs, specifically "heroin, speed, pot," but he claimed that he stopped using drugs in February 2020 when he was arrested and went to jail for criminal trespass. However, he acknowledged

11

that he had a "brief recent relapse" with "speed" two-and-a-half months ago and with marijuana "somewhere" between February 2020 and August 2021. When asked if he had received any treatment since his last relapse, Father testified, "I treat myself. . . . I know what to do."

Father wanted Daughter returned to his care and for her "to have contact and a good relationship with both her parents, whether we're together or not, whether, you know, she wants to speak with me or not right now or whatever." He added, "We're both good parents. There's been a lot that's happened in this case, and I don't think it really reflects, you know, what's gone on. But [Mother's] . . . a good mom. She's . . . not . . . a bad mother, you know, or a bad person." When asked how he would support Daughter, Father testified that he was "a building contractor by trade" and that "there's plenty of work right now." Father planned on living with Grandmother at first and then getting his own place. He estimated that his current salary was approximately $25,000 per year.

Ben Hicks, manager for the Guiding Light Sober Living House, where Father currently resides, testified that Father does his required chores and pays his required rent at the house and that he attends Alcoholics Anonymous (AA) meetings. Hicks testified that he had "no concerns" about Father's behavior and no reason to believe that he was under the influence of drugs.

Wesley Riddles, Father's friend and AA sponsor, testified that Father was working the program and "taking it seriously." Riddles explained that Father "is doing all the things that [Riddles] would have any sponsee do to recover from this seemingly hopeless state. [Father] is following the uncomfortable suggestions, as well as the easy things, and . . . that's what we need him to do." Riddles added, "Even a busted car is not keeping this man . . . out of the program, and he's not shy about asking for a ride to a meeting. He seems to be very serious

12

about recovery." Riddles did not know of any instance in which Father had relapsed during the approximately two months that they had been working the program together. Riddles testified that Father had admitted to him that he had abused alcohol, heroin, and methamphetamines in the past but that he denied perpetrating domestic violence.

Dr. Molly Peter performed psychological evaluations on Mother and Father in June 2020. Peter diagnosed Mother with stress-related disorder but with "symptoms [] not significant enough to warrant a full diagnosis of post-traumatic stress disorder." Mother also suffered from "cannabis use disorder" and "stimulant use disorder," both of which Peter considered to be "in early remission." Peter diagnosed Father with stress-related disorder, "opioid use disorder," "cannabis use disorder," "cocaine use disorder," "alcohol use disorder," and "stimulant use disorder," with Father reporting to Peter that he had last used methamphetamine and heroin in February 2020. Peter also diagnosed Father with "antisocial personality disorder" that included "narcissistic and paranoid personality features." Peter described this disorder as follows:

> So very generally, that personality disorder is consistent with a pattern of behavior that is at odds with social norms or disregard for others. So some of the—the criteria that are consistent with that diagnosis are a history of violation of social norms, usually presented as unlawful behavior; a—a tendency to—to engage in aggressive or irritable behavior, history of assault. There's also a tendency to act impulsively, a tendency to engage in full violating behavior, and a lot of remorse and responsibility for those behaviors.

Peter added that although "antisocial personality disorder cannot be used in a predictive manner to predict domestic violence," the disorder is "related to aggressive outbursts."

Terry Cook, a psychotherapist, provided counseling services to Mother and Father to address their "behavior that led to CPS" involvement, their "cognitive processing of

13

self-development," "the risk to [their] child" that they presented, and their "substance abuse issues." Cook testified that both Mother and Father addressed the concerns and goals that he had established with them, and he successfully discharged them from therapy in April 2021. Cook added, however, that the therapy had not addressed domestic violence because each parent indicated to Cook that "there was no domestic violence" in their relationship at that time. Cook also testified that he could not support either parent getting full custody of Daughter because "both of them have a lot of stuff that they need to deal with" and "both need long-term therapy." Cook recounted that in his sessions with Father, he had seen Father be "vindictive" in his "outbursts and tone towards Child Protective Services in how they're treating the case," and he opined that antisocial personality disorder could cause an individual to be "fully domineering" and controlling of his environment to an extent that could "lead into the domestic violence stuff."

Lena Lockwood was the Department caseworker assigned to Daughter's case beginning in September 2020. Lockwood testified that Mother completed her psychological assessment, OSAR assessment, parenting courses, and individual therapy. Father also completed most of his services, except for his participation in BIPP, which Father was "around halfway through." Regarding their drug usage, Lockwood testified that Mother and Father began testing negative for illegal substances in March or April 2021 other than low doses of marijuana. At that time, they were allowed to have supervised visits with Daughter. Father, however, tested positive in August 2021 for "heroin, amphetamines, methamphetamines, as well as opiates." When confronted with the test results, Father claimed that "he was on some medications related to dental surgery that were intended to mitigate pain [] post-surgery."

Lockwood testified that the appointment of Mother as possessory conservator pursuant to the MSA was in the best interest of Daughter because Mother had "engaged

14

meaningfully in her service plan" and "was consistently engaging in visitation and had reached the stage of unsupervised visitation in a community setting." Lockwood explained,

> [Mother] has attempted to engage, I think, meaningfully in her services to try to work towards addressing the Department's concerns, and she had reached a stage of unsupervised visitation for a time. And because while [Mother] is—we don't believe is appropriate to be a sole managing conservator or—or to have a return with [Daughter] at this time, based on her continuing to need to work on her ability to provide a safe and stable home and not being able to do that at this time, I don't have the impression or—or haven't seen her behave in a way that would make me concerned that [Mother] would attempt to, you know, intimidate or be a safety concern for anyone else involved in a PMC-PC type of arrangement.

Lockwood also testified that based on her knowledge of Mother, "it would have been very out of character" for Mother to have attempted to assault Father with a vehicle as he alleged.

However, Lockwood acknowledged that Mother's "circumstance right now is not a stable one" and that "while we hope that she is on the path to getting to a better place . . . it will be some time before she is able to, as a parent, manage on her own a safe and stable household." Thus, the Department also believed that it was in Daughter's "best interest for the Department to take permanent managing conservatorship at this time in order to continue to work to find a circumstance or situation which would allow for a kinship option or other placement option."

The Department believed that it would not be in Daughter's best interest for Father to have possessory conservatorship because the Department was concerned about the "pattern of domestic violence" and "pattern of control" that Father had exhibited toward Mother. Lockwood added that Father had not completed his BIPP course and "has struggled to make progress . . . on the dimension of accountability, with regards to recognizing and addressing his domestic violence concerns as a perpetrator." The Department was also "concerned regarding the drug testing positive and that [Father] still . . . has not produced documentation regarding

15

prescriptions to explain that." When asked why she believed termination of Father's parental rights was in Daughter's best interest, Lockwood testified,

> Because [Father] has not fully completed his services to alleviate the things that led to the Department's concern about [Daughter] remaining in [Father's] care. [Father] has continued to—there's been a continued pattern of engaging in domestic violence and a pattern of intimidation that is concerning to the Department. He has continued to—to use substances. He has continued to—to use substances of concern of—of abusing drugs.

The Department was also concerned that Father would use control and intimidation in any future arrangement with a managing conservator, based on his history with Mother and others. Lockwood testified that she had had conversations with Father over the phone in which he had been verbally abusive to her and that Father had been "verbally aggressive" with others in the Department as well. Lockwood summarized Father's criminal history, which included convictions in 2019 for unauthorized use of a motor vehicle and attempted escape while in custody, 2018 for possession of heroin and possession of methamphetamine, 2017 for assault-family violence, and 2014 for assault-strangulation. Copies of those judgments of conviction were admitted into evidence.

Regarding the Department's permanency plan for Daughter, Lockwood testified,

> The Department hopes to continue to search for an appropriate kinship placement or option, whether we will be able to work with a family member to help them to build their home to be appropriate or locate another option that might be approved; and to—and who might be able to appropriately be able to maintain a PMC-PC arrangement to allow [Daughter] to maintain a connection to her family to the greatest degree we can.

Lockwood testified that the Department had already performed home studies on Grandmother and Grandfather as possible placements but had denied them both. Grandmother's placement was denied because of concerns that Grandmother would not "maintain a protective boundary" between the parents and Daughter given that Grandmother "seemed to minimize . . . the danger" that the violent relationship between Father and Mother presented to Daughter. Grandfather's placement was denied because he had failed to call law enforcement on the night that he discovered Father assaulting Mother and because he refused to disclose to the Department the number and location of firearms inside his residence, which concerned the Department because of Daughter's young age. Lockwood testified that Hitchcock was another possible placement that the Department might consider, but no home study had been conducted on her yet.

While the Department continued to search for a kinship placement for Daughter, she had been placed with Liliana Vasquez, Daughter's foster mother since May 2020. Vasquez testified that Daughter was "healthy" and "doing well" in her care, with "good report[s] in all of her routine checkups." Vasquez explained that Daughter was "talking a lot right now," "loves being outdoors," "loves playing," "loves learning her numbers," and "loves reading." Vasquez did not believe that it would be in Daughter's best interest to remove Daughter from her care. Although Vasquez had expressed an interest in adopting Daughter, she testified that she was not willing to share conservatorship with either of the parents because of their history with drugs and domestic violence.

However, Lockwood testified that there was no indication that Vasquez would be unwilling to keep Daughter in her care until the Department was able to find an appropriate family for her. Lockwood also testified that the Department "would hope to keep working with

Ms. Vasquez, the foster mother, to try to alleviate her concerns" and "see if there's a possibility that . . . she might change her mind. We would hope to continue that conversation with her and see if there's anything that we could do to facilitate her coming around to that."

The district court asked Lockwood to explain the Department's long-term plan for Daughter. In response, Lockwood testified as follows:

> [I]f the Department were named nonparent sole managing conservator, the Department wouldn't want to just be the nonparent sole managing conservator forever, of course. And our intention would be to—if Ms. Vasquez changes her mind or can possibly come around, that is something that we would consider, that she would enter into a PMC-PC agreement. The Department would also like to continue working—working with or looking into possible kinship caregivers that might be appropriate for [Daughter], that might be able to enter into a PMC-PC agreement. And barring that, I would go to my supervisor or program director about continuing to look for other foster care options that might be able to provide that kind of PMC-PC agreement, if Ms. Vasquez is not willing to. Our intention isn't to just have PMC of [Daughter] until she's 18, by any means, but to—to locate an arrangement, an appropriate caregiver that could act under such an arrangement, as Ms. Vasquez is not willing to at this time.

Lockwood added that the Department would continue "to work with the family and the family system" to identify potential kinship placements, noting that "[w]hile [Grandmother] and [Grandfather] may not have been approved" at that time for placement, "they still appear to be persons who care about [Daughter]."

At the conclusion of trial, the district court found by clear and convincing evidence that termination of Father's parental rights was in Daughter's best interest and that Father had (1) knowingly placed or knowingly allowed Daughter to remain in conditions or surroundings which endanger her physical or emotional well-being, (2) engaged in conduct or knowingly placed Daughter with persons who engaged in conduct which endanger her physical or emotional well-being, and (3) failed to comply with the provisions of a court order that

18

specifically established the actions necessary for Father to obtain the return of Daughter. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O), (2). The district court also approved the MSA between Mother and the Department and found that the MSA was in the best interest of Daughter. This appeal by Father followed.

## STANDARD OF REVIEW

"Section 161.001 of the Texas Family Code requires two findings to support termination of a parent's legal rights: (1) the parent's acts or omissions must satisfy an enumerated statutory ground for termination; and (2) termination must be in the child's best interest." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021); *see In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam); *A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 697 (Tex. App.—Austin 2019, pet. denied). "Proceedings to terminate the parent-child relationship implicate rights of constitutional magnitude that qualify for heightened judicial protection." *In re A.C.*, 560 S.W.3d 624, 626 (Tex. 2018). Parental rights have been characterized as "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (citing *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)). They are "perhaps the oldest of the fundamental liberty interests" protected by the United States Constitution. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *E.E. v. Texas Dep't of Fam. & Protective Servs.*, 598 S.W.3d 389, 396 (Tex. App.—Austin 2020, no pet.). "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky v. Kramer*, 455 U.S. 745, 759 (1982). "Consequently, termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent." *Holick*, 685 S.W.2d at 20. "Because termination of

19

parental rights 'is complete, final, irrevocable and divests for all time' the natural and legal rights between parent and child," a trial court "cannot involuntarily sever that relationship absent evidence sufficient to 'produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *A.C.*, 560 S.W.3d at 630 (quoting Tex. Fam. Code § 101.007; *Holick*, 685 S.W.2d at 20). "This heightened proof standard carries the weight and gravity due process requires to protect the fundamental rights at stake." *Id.*

"A correspondingly searching standard of appellate review is an essential procedural adjunct." *Id.* "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *Id.* "Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id.* at 631. "Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id.* "In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id.* "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*

However, "an appellate court's review must not be so rigorous that the only factfindings that could withstand review are those established beyond a reasonable doubt." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). "While parental rights are of constitutional magnitude, they are not absolute." *Id.* "Just as it is imperative for courts to recognize the constitutional

20

underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *Id.*

**DISCUSSION**

On appeal, Father challenges only the sufficiency of the evidence supporting the district court's finding that termination of his parental rights was in Daughter's best interest. When deciding the best-interest issue, we consider the well-established *Holley v. Adams* factors, which include the child's wishes, the child's emotional and physical needs now and in the future, emotional or physical danger to the child now and in the future, the parenting abilities of the parties seeking custody, programs available to help those parties, plans for the child by the parties seeking custody, the stability of the proposed placement, the parent's acts or omissions indicating that the parent-child relationship is improper, and any excuses for the parent's conduct. 544 S.W.2d 367, 371-72 (Tex. 1976); *see A.C.*, 560 S.W.3d at 631; *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *C.H.*, 89 S.W.3d at 27. The *Holley* factors are not exhaustive, not all factors must be proved, and a lack of evidence about some of the factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence [was] undisputed that the parental relationship endangered the safety of the child." *C.H.*, 89 S.W.3d at 27. "We must consider 'the totality of the circumstances in light of the *Holley* factors' to determine whether sufficient evidence supports" the best-interest finding. *In re J.M.G.*, 608 S.W.3d 51, 54 (Tex. App.—San Antonio 2020, pet. denied) (quoting *In re B.F.*, No. 02-07-00334-CV, 2008 WL 902790, at *11 (Tex. App.—Fort Worth Apr. 3, 2008, no pet.) (mem. op.)).

In his first issue, Father argues that the evidence is legally and factually insufficient because "the Department agreed to leave incarcerated Mother's rights intact, intended a coparenting arrangement against the wishes of the foster parent, and its only backup plan for the 2-year old's future permanency was with alcoholic or unprotective family members who had already failed home studies." In his second issue, Father focuses on his substantial compliance with the terms of his family service plan, arguing that his "changed circumstances, including making significant progress in his service plan, points to a lack of clear and convincing evidence of best interest." He also takes issue with the Department's decision to not terminate Mother's parental rights, contending that Father and Mother are "similarly situated."

The Department's permanency plan at the time of trial was not ideal. By the Department's own admission, Mother's "circumstance right now is not a stable one," but the Department had signed an MSA with Mother for her to be named possessory conservator.[2] Foster mother did not want to share conservatorship of Daughter with Mother, and home studies had been denied on both Grandmother and Grandfather, the two most likely kinship placements, leaving Daughter with an uncertain future. However, the lack of a suitable future placement for Daughter is but one *Holley* factor, relevant but not determinative of best interest. *See C.H.*, 89 S.W.3d at 28 (explaining that "lack of evidence about definitive plans for permanent placement and adoption" are "relevant to best interest" but "cannot be the dispositive factor").

Daughter was currently placed in a positive environment with a caring foster mother, where she was doing very well, and Department caseworker Lockwood testified there was no indication that the foster mother would be unwilling to keep Daughter in her care until

---

[2] Generally, MSAs are binding on the parties to the agreement and, subject to narrow exceptions not applicable here, binding on the trial court. *See* Tex. Fam. Code § 153.0071; *In re A.C.*, 560 S.W.3d 624, 632–33 (Tex. 2018).

the Department was able to find an appropriate family for her. Lockwood also testified that the Department "would hope to keep working with Ms. Vasquez, the foster mother, to try to alleviate her concerns" and "see if there's a possibility that . . . she might change her mind. We would hope to continue that conversation with her and see if there's anything that we could do to facilitate her coming around to that." Additionally, although the foster mother testified that she would be uncomfortable sharing parental rights with either parent, she also indicated that "particularly," she would not "feel safe if [she] had to share parental rights with the father." Thus, the district court could have reasonably inferred that there was a better chance of the foster mother agreeing to share conservatorship with Mother than with Father. Although the foster mother's relative comfort level with each parent is not determinative, this is another relevant consideration that supports the district court's best-interest finding.

Additionally, the foster mother (and others) did not feel safe with Father because of his history of domestic violence. Although Father denied this history, multiple witnesses testified that Father was a "violent man," including Mother, who testified that Father had assaulted her between six and eight times during their relationship and had threatened her with bodily injury between 50 and 100 times. Mother described some of the assaults in detail, and Grandfather observed one of the assaults on his security cameras. Additionally, Father had been violent with his brother's fiancé on two occasions and had been convicted of assaulting two of his ex-girlfriends. Thus, the district court could have reasonably inferred that Father had a documented history of violence against women and that this history made him an unsafe caregiver for Daughter. Father was also verbally aggressive with Grandmother and Department caseworkers, had a history of drug use, and was not financially stable. The district court could have looked at this and other evidence, summarized above, including Dr. Peter's diagnosis of

23

Father's "antisocial personality disorder," and concluded that Father was not a safe placement for Daughter.

Regarding Father's substantial compliance with his service plan, it is true that he had completed most of his services by the time of trial, and there was evidence that his failure to complete his BIPP was because the Department referred him to that service too late in the case for him to complete it. However, "a parent's compliance with a service plan does not preclude a finding that termination is in the child's best interest." *In re A.C.B.*, 198 S.W.3d 294, 298 (Tex. App.—Amarillo 2006, no pet.). Here, the Department's primary concern with Father was his "continued pattern of engaging in domestic violence and a pattern of intimidation." That concern remained at the time of trial, even though Father claimed to have already completed a batterer's intervention course while in prison for a prior assault. His assaults against Mother happened after he supposedly took that course. Thus, the district court could have reasonably inferred that completing an additional course would not succeed in making Father a less violent person. *See In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied) (explaining that in determining best interest, "trier of fact may measure a parent's future conduct by his past conduct" and "pattern of behavior").

Finally, Father places significant emphasis on how he and Mother were "similarly situated," but his parental rights were terminated while hers were not. However, although some aspects of their situations were similar, Father had a lengthy history of domestic violence while Mother did not. Mother's one alleged incident of violence was Father's claim that she had attempted to run his vehicle off the road in her vehicle. Mother denied that she had done this, and the district court was entitled to believe her denial, particularly considering that Father's claim was not corroborated at trial. Mother's accounts of Father's physical abuse, on the other

24

hand, were corroborated by multiple witnesses. *See In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (explaining that reviewing court must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses").

Based on the totality of the circumstances in this case, we conclude that the evidence is legally and factually sufficient to support the district court's finding that termination of Father's parental rights was in the best interest of Daughter. We overrule Father's first and second issues.

## CONCLUSION

We affirm the district court's termination decree.

_____

Gisela D. Triana, Justice

Before Justices Goodwin, Baker, and Triana

Affirmed

Filed: May 27, 2022